UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY SEMONES,<br><br>Defendant. | Case No. 1:20-cr-00043-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is third-party creditor Banatao Living Trust's ("the Trust") Petition / Objection to Forfeiture (the "Petition"). Dkt. 53.[1] The Court held oral argument on May 12, 2021, and took the matter under advisement. Upon review, and for the reasons set forth below, the Court DENIES the Trust's Petition.

## II. BACKGROUND

This is a criminal case. On February 12, 2020, the Grand Jury indicted Semones on ten counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a). Dkt. 1. The indictment also included wire fraud and money laundering forfeiture allegations which asserted that Semones would forfeit any and all proceeds and/or assets derived from, or fairly traceable to, his criminal conduct. *Id*. at 5–6.

---

[1] The Trust originally filed its Petition at Dkt. 40. It then refiled it at Dkt. 41 to correct errors it discovered. The Trust ultimately filed its Petition a third time at Dkt. 53 to correct errors pointed out by the Government.

MEMORANDUM DECISION AND ORDER - 1

The underlying facts of Semones criminal conduct can be summarized as follows: Semones embezzled and misappropriated funds from his employer, ETA Compute, and directed those fraudulently obtained proceeds to the construction of a house at 29 Lake Creek Drive, Ketchum, Idaho (the "Lake Creek Drive property"). The scheme occurred between October 2017 and November 2018.

On August 6, 2020, Semones entered into a plea agreement with the United States in which he agreed to plead guilty to Count Nine of the Indictment (one of the wire fraud charges). Semones also admitted the asset forfeiture allegation in the Indictment. Dkt. 19, at 2. Consistent with the plea agreement, the Lake Creek Drive property was sold. The sale price generated sufficient proceeds to pay full restitution to ETA Compute. An additionally $191,841.54 in proceeds was retained by the United States Marshal's Service in its Seized Assets Deposit Fund.

Prior to sentencing, the Government filed a Motion for Preliminary Order of Forfeiture, Final as to Defendant. Dkt. 30. Therein, the Government noted that, pursuant to the plea agreement, Semones agreed to forfeit the $191,841.54 that was seized as this money was "derived from, and traceable to, the misappropriation of funds" that made up Semones' crime. Dkt. 19, at 5. On December 1, 2020, the Court issued an order adopting the Preliminary Order of Forfeiture. Dkt. 34. Therein, the Court outlined that "any person asserting a legal interest in the Subject Property, or other forfeited property, must file a claim with the Court within the applicable deadlines." *Id*. at 4.

On February 9, 2021, the Trust timely filed its Petition, objecting to the Court's preliminary order of forfeiture. Dkt. 41. In its Petition, the Trust claims an interest in the

MEMORANDUM DECISION AND ORDER - 2

$191,841.54 seized funds currently held by the Government.

The Court ultimately sentenced Semones to 36 months imprisonment, with three years of supervised release to follow. Dkt. 47.

Following sentencing, the Government filed an objection to the Trust's Petition. Dkt. 50. The Trust replied. Dkt. 54.[2] The Government then filed a Motion to Strike (Dkt. 56) arguing that the Trust had improperly raised a new argument in its reply brief. The Government asked that the court strike the argument or allow it to file a sur-reply. The Trust did not object to the Government's request to file a sur-reply (Dkt. 57), the Court granted the request (Dkt. 58), and the Government filed its sur-reply (Dkt. 59).

The Court then held a hearing and took the matter under advisement.

## III. LEGAL STANDARD

Forfeiture in a criminal case is essentially a two-stage process.

First, the Court considers forfeiture of the criminal defendant's interest in identified property and issues a Preliminary Order of Forfeiture, forfeiting the defendant's interest to the United States. Fed. R. Crim. P. 32.2(a)–(b).

Second, under 21 U.S. Code § 853(n)(2) any person, other than the defendant, asserting a legal interest in the forfeited property may petition the court in the "ancillary proceeding" for a hearing to adjudicate the validity of his or her alleged interest in the property. *See also* Fed. R. Crim. P. 32.2(c)(1). Any party bringing a petition must establish "by a preponderance of the evidence that the petitioner has a legal right, title, or interest in

---

[2] The Trust's reply brief does not comply with the District of Idaho's local rules regarding spacing. *See* Dist. Idaho Loc. Civ. R. 7.1(a)(2). In the future, Counsel should consult the local rules to ensure all briefing is in compliance.

the property, and such right, title, or interest renders the order of forfeiture invalid . . . ." 21 U.S. Code § 853(n)(6)(A).[3]

Upon resolution of the "ancillary proceeding," the Court will enter a Final Order of Forfeiture, resolving the third-party claims. Fed. R. Crim. P. 32.2(c)(2).

## IV. DISCUSSION

Both the Government and the Trust acknowledge this case presents the complex intersection of various legal principles and various legal proceedings. The Court begins its discussion with additional factual background to aid the reader. It will then discuss the parties' various arguments regarding forfeiture.

### A. Background

In December 2011, the Trust loaned Semones $1,000,000.00 to fund construction costs associated the Lake Creek Drive property. This loan was memorialized by a promissory note which obligated Inphi Partners, LLC, to repay the loan with interest. The promissory note was guaranteed by Semones—the sole member of Inphi Partners, LLC. The promissory note was also secured by a deed of trust.

Sometime after the execution of this loan, the Trust released its senior lien in order to allow a hard money lender, United Bridge Capital, to loan roughly $2.22 million to Semones (and/or Inphi) to complete the Lake Creek Drive property.

On January 24, 2019, Semones filed for chapter 11 bankruptcy. That case is currently pending in the United States Bankruptcy Court for the District of Idaho as Case

---

[3] There is a second avenue whereby a petitioner may argue he or she was a subsequent bona fide purchaser of the property and did not know it was subject to forfeiture. 21 U.S. Code § 853(n)(6)(B). The Trust only claims to fall under subsection (A) therefore the Court's analysis is limited to that portion of the statute.

No. 19-40057-JMM. As already explained, in early 2020, Semones was indicted on the current charges that detail criminal behavior which occurred between October 2017 and November 2018. In August 2020, the Court accepted Semones guilty plea.

On February 5, 2021, the bankruptcy court conducted an evidentiary hearing on confirmation of the Fourth Amended Chapter 11 Plan of Reorganization ("the Plan"). Dkt. 41-3. Relevant to the Court's discussion today are three provisions within the Plan. First, the Plan noted that United Bridge Capital had a secured claim in the amount of roughly $2.2 million, that it held a first-position lien on the Lake Creek Drive property, and that the prior sale of the property fully satisfied the debt it was owed. *Id*. at 7. The Plan next noted that Eta Compute, Inc. had a secured claim in the amount of $1.8 million, held a second-position lien on the Lake Creed Drive property, and that the prior sale of the property (and the transfer of certain stock) fully satisfied the debt it was owed. *Id*. at 7–8. Finally, the Plan noted that the Trust has a "presently-unsecured" claim in the amount of $191,000, that the United States Marshal Service was in possession of those specific funds, and that "all rights of the Debtors to recover those proceeds held by the United States Marshal[] shall be assigned to [the] Trust." *Id*. at 8. The Trust filed its motion in this case shortly after the Plan was confirmed by the bankruptcy court.

The Court moves next to various arguments raised by the parties.

**B. Standing**

As a threshold matter, the Government contends that as an unsecured general creditor, the Trust does not have standing to assert a claim against the forfeited funds. "It is well-established that general, unsecured creditors lack standing to contest the forfeiture

of the defendant's property." Stephan D. Casella, *Asset Forfeiture Law in the United States* § 23-13(c), pg. 819 (2nd ed. 2013) (citing cases); *see also United States v. White*, 675 F.3d 1073, 1080–81 (8th Cir. 2012) (agreeing with other circuits that general unsecured creditors lack standing because they have no interest in any particular asset); *United States v. Eldick*, 223 Fed. Appx. 837, 839–40 (11th Cir. 2007) (finding that a fraud victim, who voluntarily transfers property to a defendant and retains no interest in the property, may have a cause of action in tort, but has no interest other than as an unsecured creditor, which is insufficient to challenge forfeiture in the ancillary proceeding).

The Trust analyzes the cases cited by the Government and contends each is factually distinguishable. Specifically, the Trust points out that unlike the cases cited by the Government, it has always had an enforceable contract and its interests was, at least at one time, secured.[4] This factor is, to some degree, immaterial. Regardless of any prior interest, the underlying legal premise is that any party who does not have a *presently* secured interest in the forfeited property does not have standing to object to forfeiture. To be sure, the Trust's "prior interest" arguments aside, it recognizes that it is an unsecured creditor in the general sense, or at least it did originally.

At oral argument, for the first time, the Trust explained that the more concise way to explain its interest is that of being "unperfected," not necessarily "unsecured." It argued

---

[4] The Trust also argues that one of the reasons many of the courts (in the cases cited by the Government) did not grant relief to the various petitioners was that it found the they were friends, family, or alter egos of the respective criminal defendants. The Trust argues such is not the case here. Because the Court is denying the petition for many other reasons, it will not formally rule on this issue. However, the Court notes that it is leery of this argument. Semones and the Trust appear to have a decades-long relationship that involves multi-million-dollar loans, stock transfers, the use of family trusts, and each entity or person taking various roles in the other's business ventures.

not only that this distinction adds to its argument that it has standing, but also illustrates that it has a greater interest (i.e. a higher priority) in the forfeited property than the Government. The Court will discuss this distinction in the following section, but assumes, without formally deciding, that the Trust has standing to bring its Petition today.[5] The cases cited by the Government are persuasive, however, as will be explained below, even assuming the Trust has asserted a legally cognizable interest sufficient to grant it formal standing, it cannot meet its burden and establish that it has an interest in "the property which has been ordered forfeited." 21 U.S.C. § 853(n)(2).

### C. Unsecured and unperfected

At oral argument, the Trust argued that a better way to conceptualize its interest in this case was not that it was unsecured, but rather unperfected.[6] The Trust explained that when it loaned Semones the $1 million in 2011, he gave it a security interest in the form of a deed of trust. That deed of trust was executed in 2006. And in that deed of trust—like most security documents—it stated that "this deed of trust shall stand as continuing security until paid for all advances together with interest thereon." Dkt. 41-7, at 2. The Trust goes on to argue that later on when Semones needed more money, it was in its interest to let

---

[5] Federal Rule of Criminal Procedure 32.2(c)(1) allows a person "*asserting* an interest in the property" to bring a petition. The Trust has asserted such an interest that, while maybe not sufficient for general standing, gets it through the door today.

[6] This is in stark contrast to the Trust's arguments in briefing that "while its interest may no longer be secured" they remain superior to the Government's interest (Dkt. 54, at 4); that its "unsecured interest is related to . . . an interest that was initially secured" (*Id.*); that it is a "general unsecured creditor solely because Semones concealed his criminal behavior" (*Id.*); that "the Trust's interest may have become unsecured, but its contract is still related to the originally secured loan" (*Id.* at 6); that "The United States overemphasizes the effect of the Trust's unsecured status" (*Id.* at 7); and that the Trust's "previously unsecured interest derives from a previously secured interest" (*Id.* at 8) (underlining added for emphasis).

MEMORANDUM DECISION AND ORDER - 7

United Bridge Capital take first position status. In order to do that, however, it needed to move out of first position.[7] Thus, it had the title company issue a deed of reconveyance.[8]

And as the Trust notes, in this deed of reconveyance there is no language indicating the security agreement was satisfied—as most deeds of reconveyance do—but simply language that whatever interest it (the title company) had was conveyed back to the parties legally entitled to it (Semones and/or the Trust). In short, the Trust argues that all the deed of reconveyance did was unrecord the deed of trust so that United Bridge Capital could come in and loan money on the project, but that it did not somehow make its interest unsecured.

The Trust goes on to state that irrespective of those activities, because its deed of trust was still valid and enforceable (albeit unrecorded), its interest in the forfeited property is senior in priority to the Governments' interest because its interest existed before the Government's interest arose. In order to make this argument, the Trust relies on *U.S. v. Wilson*, a 2011 case from the Ninth Circuit. While the Court will discuss this case in the following section, it must, nonetheless (as it did in the previous section) comment on this particular argument.

Based upon the evidence in the record, it appears that the Trust's deed was (and still is) in effect and enforceable and that it is also unrecorded.

Now, without getting into semantics, the Court makes two observations. First,

---

[7] Again, while originally using the term "unsecured" to describe what happened when it moved out of first position, the Trust tactfully avoided such terminology at oral argument and simply said United Bridge Capital moved into that position.

[8] This document was not filed in CM/ECF, but was presented as Exhibit I at the hearing on May 12, 2021.

regardless of whether the Trust's interest was secured, unsecured, perfected, or unperfected, its interest was, nonetheless, inferior to United Bridge Capital's interest and Eta Compute, Inc.'s interest in the Lake Creek Drive property.[9] Second, the Trust refers to itself as an "unsecured" creditor throughout the bankruptcy case—and, as noted above, throughout this case. *See infra* n.6. To be sure, the Court recognizes that lien priority is not the same as secured, unsecured, perfected, or unperfected. What's more, the Court does not have any real issue with a party refining terms during the course of litigation to describe its status; however, these factors are noteworthy because they illustrate (at least in part) that the Trust has only recently come to this conclusion. This, in turn, will become important in the Court's discussion regarding a constructive trust.

In sum, like granting the Trust standing for sake of the Petition, the Court will recognize the Trust's interests as being secure but unperfected. Nevertheless, as will (eventually) be made clear, even this assumption does not save the Trust's arguments.

As noted, the Trust asserts—with its newfound "secured" status—that under *U.S. v. Wilson*, 659 F.3d 947, 954 (9th Cir. 2001), its interest is superior to the Government's interest in this case. The Court cannot so easily find.

In *Wilson*, the Defendant (Wilson) operated a Ponzi scheme that took roughly $13 million from over 50 investors—including one, Richard Gray. In the course of the criminal proceedings, the Government seized about $2 million from Wilson and the Court granted an initial order of forfeiture on the same. Certain third parties, including Gray, filed a

---

[9] It had to be so; otherwise, these companies likely would not have loaned Semones money in the first place.

MEMORANDUM DECISION AND ORDER - 9

petition seeking an interest in the forfeited monies. The District Court found that while a constructive trust formed (for Gray) at the moment of the fraudulent activities, he did not have standing to object to the restitution and, furthermore, that his interest did not supersede the Government's interest. *Id*. at 950–51.

The Ninth Circuit found the District Court erred when it found Gray lacked standing and that it also erred when it found his interest was inferior to the Government's interest. The Ninth Circuit explained that the Government's interest in the property arose when Wilson committed the criminal acts in question. It also determined that a constructive trust formed when the fraudulent activities began giving Gray a "simultaneous" interest. It went on, however, to hold that Gray's interest was superior to the Government's interest because his "existed prior to the event that gave rise to the Government's interest," *id.* at 954, and the Government was "merely standing in Wilson's shoes, and its interest cannot exceed Wilson's interest." *Id*.

The Trust argues that the same applies here. Because the Government is standing in Semones' shoes, it cannot have a greater interest than the Trust because the Trust's interest arose at the same time as the Government's interest (via a constructive trust). The Trust continues by arguing that because it had a prior legal interest in the property, its interests are actually paramount to the Government's interest.

This premise is flawed for two reasons. First, *Wilson* specifically dealt with a fact pattern in which the third-party had a constructive trust in the forfeited property. As will be explained below, no such constructive trusts exist in this case. Second, and relatedly, it is critical to note the factual distinction between *Wilson* and the present case. In *Wilson*,

the forfeited money was the subject of the underlying crime (i.e. Wilson stole money from investors, that money made up the charges against him, and that money was what was forfeited). Here, the Trust's money is not at issue. Semones actions with the Trust's money were not illegal. The indictment in this case never alleged that Semones fraudulently obtained, misappropriated, or illegally used the money from the Trust. Again, such could not be the case when the $1 million from the Trust was a valid loan.

The Court also notes that on remand, the Ninth Circuit in *Wilson* specifically noted that Gray would need to "meet the burden of proof set out in the statute" and prove "the traceability of the funds" in question. *Id*. at 956. This is also a problem for the Trust.

In short, the Trust's reliance on *Wilson* is scant at best. So, while its interest may be secured (but unperfected), it is not senior to the Government's interest because no constructive trust arose in this case. The Court turns next to this question.

**D. Constructive Trust**

As part of its reply brief, the Trust raised—for the first time—that it is entitled to the forfeited funds under the theory that a constructive trust formed at the time of Semones' crime. The Government filed a Motion to Strike, noting that the Trust had not raised this argument in its original brief. Dkt. 56. The Government stated that if the Court elected to let this lately filed argument stand, it should grant it an opportunity to respond. The Trust did not object to the request (Dkt. 57), and the Court granted the same (Dkt. 58).

"[A] constructive trust can serve as a superior legal interest under section 853(n)(6)(A) and thus can serve as grounds for invalidating a criminal forfeiture." *United States v. Shefton*, 548 F.3d 1360, 1366 (11th Cir. 2008). Whether any party is entitled to a

constructive trust is a matter of state law. *Id*. at 1274 (citing *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007)). Under Idaho law, "[a] constructive trust arises when legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property." *Hettinga v. Sybrandy*, 886 P.2d at 772, 775 (Idaho 1994) (quoting *Witt v. Jones*, 722 P.2d 474, 477 (Idaho 1986)).

The problem the Trust faces in this case is that it cannot show Semones obtained the $1 million through fraud, misrepresentation, or any other deviant behavior.[10] By all accounts, he obtained the loan from the Trust and used it to further the development of the Lake Creek Drive property. This dooms its constructive trust theory.

Interestingly, the Trust does not argue that Semones obtained its money via fraud, but rather that it was "induced to give up its senior trust deed based on assertions that it was necessary to get a hard-money loan to complete the property so it could be sold to generate proceeds to repay the Trust" and that it would not have "released its lien had Semones not concealed his intent to take monies from other victims of his financial crimes." Dkt. 54, at 7. Said differently, the Trust does not claim that Semones obtained title to its original monies via fraud, but that he "fraudulently" thwarted their chances of

---

[10] The Trust argued at the hearing that it did not need to show actual fraud or even misrepresentation, but that the "catch all" provision from *Hettinga*—that a constructive trust can arise "under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property"—would allow it to plead the general unfairness of the situation. The Court agrees that actual fraud need not always be found in order for a constructive trust to arise. However, even under the lesser "unconscionable" standard, the Trust cannot meet its burden. There is literally nothing in this case to suggest *any* improper behavior on Semones' part vis-à-vis the Trust and the $1 million loan.

receiving repayment.

This is a creative argument, but it misses the mark. The question the Court must address is whether Semones obtained the property from the Trust (in this case, the $1 million) via fraud or misrepresentation. Clearly the answer is no. The Trust willfully gave Semones the $1 million as a legally valid and binding loan. As will be explained in the next section, the Trust cannot trace any of its money to the extent necessary to prove that the forfeited funds should be returned to its possession. *See United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer."). In short, a constructive trust *did not* arise in this case.

The Trust's argument is also speculative and somewhat convoluted. In essence, it claims that had it known of Semones' *future* fraud, it never would have loaned him the money back in 2011. While that is undoubtedly true, this argument cannot serve as the basis for a claim that Semones obtained the original loan by fraud. Again, the Trust has not pointed to *any* fraudulent activities Semones engaged in that induced it to loan him the money, nor has it pointed to any fraudulent activities that Semones engaged in with the money from the loan. Again, this connection (or lack thereof) will be discussed in greater detail below, but in the context of a constructive trust, the concept is also critical. The Trust loaned Semones the $1 million *six years* before the events giving rise to his criminal charges and the forfeiture in this case. Now, maybe Semones was plotting and planning to commit criminal acts six years prior to when he actually did, but even if that were the case, it still does not change the fact that the Trust's money was not at issue in the crimes at bar

or the subject of the forfeited funds.

This brings the Court to its final analysis: the connection between the Trust's interest and the forfeited funds.

### E. Traceability of Funds

The Trust has put forth various arguments regarding standing and interest to get its foot in the door in order to contest forfeiture. In briefing, it contented that while its interest was unsecured, it was related to a secured interest and because a constructive trust arose, it has priority. At oral argument, it changed its tune slightly and argued that its interest wasn't unsecured so much as it was unperfected, but that despite this difference, it nonetheless had an interest in the forfeited funds. Both of these arguments rest on the fundamental premise that the Trust has an enforceable contract that Semones has yet to perform. On this point, the Court does not disagree. That said, even granting the Trust standing—and accepting its argument that its interest is secured—the Court cannot allow the Trust to come into these criminal proceedings and essentially take some "left over" money to satisfy Semones' outstanding debt.

The Court's duty in these proceedings it to determine whether the petitioner—in this case, the Trust—"has established by a preponderance of the evidence that [it] has a legal right, title, or interest in the [forfeited] property," and further, whether any "such right, title, or interest renders the order of forfeiture invalid." 21 U.S.C. § 853(n)(6)(A). In sum, the Court finds the Trust has not met its burden. And accepting most of the Trust's arguments above—except its constructive trust theory—does not mandate a different result. To understand the Court's reasoning, it helps to review what this case is *not*.

First, this is not a bankruptcy case. To some degree, the Trust acts like the forfeited funds are a large pot of money that needs to be split up between those who have interest in the funds—similar to when a bankruptcy court marshals, and divides, assets. However, such is not exactly the case with forfeited money. Yes, there are often victims in these types of white-collar cases and forfeited money can be used to make them whole, but the Trust has already admitted that it is not a victim of Semones' crimes in this case. Dkt. 54, at 3. Rather, it claims it is a victim in the common sense—that Semones' actions harmed the Trust—and that it is entitled to relief.[11] While this may be true, the distinction is critical.

The Trust was not a victim of the criminal acts that lead to the forfeited property it now seeks; it was a "victim" of the person who committed the criminal acts. It also happens that the person who committed the criminal acts owes it money. And to reiterate, the Court does not dispute that Semones' owes the Trust money from the prior loan; however, this is not the avenue to accomplish repayment. And regardless of what was determined in the bankruptcy court—i.e. that Semones' rights were transferred to the Trust and that he (Semones) would "assist" the Trust in recovering these proceeds—such a finding is not binding on the Court.

By the Trust's own admission:

> In negotiations for treatment of its claim under the Plan and prior versions thereof, the Trust agreed to accept a reduced payment of $500,000 rather than to assert the full amount owed on its Promissory Note. The Trust agreed further to look only to the proceeds of sale of the Property remaining after

---

[11] Again, however, the Trust's argument seems to rest on the premise that all the money that was forfeited needs to be "returned" or "paid" to someone. Ofttimes, forfeited property is returned (in various ways and to various individuals/entities) and there is nothing left over. But, there are also circumstances where no person or entity has an interest in the forfeited property, it is never claimed or returned, and it is simply retained by the Government pursuant to statute.

MEMORANDUM DECISION AND ORDER - 15

the payment of the Class 4 and Class 5 claimants. By so agreeing, the Trust
unfortunately found itself subject to the risks of reduction in proceeds from
sale of the Property – a risk that became reality with the arrest of Semones in
front of a buyer ready to close and the arrival of the COVID-19 pandemic.

Dkt. 54, at 4.[12] Simply put, the Trust negotiated the manner in which it would receive, or hope to receive, payment and acknowledges that it took a risk in trying to use the forfeited funds to satisfy Semones' outstanding debt obligations.

Second, this is also not a civil contract case. That Semones owes the Trust money seems obvious. And while the Trust could have sued Semones for breach of contract, it elected to take a different route. Even assuming the Trust's arguments relative to the loan and the deed of trust grant it standing in this case—and those same arguments may have been helpful in a civil contract case—they do not ultimately help the Trust reach the forfeited money in this criminal case. Semones has already agreed that the property at issue was "derived from, and traceable to, the misappropriation of funds" outlined in the indictment. Dkt. 19, at 5.

In short, the Court is not looking at this situation from a bankruptcy perspective or a civil contract perspective but from a criminal forfeiture perspective. From that standpoint, and upon review of the record and evidence before it, the Court cannot find the Trust has

---

[12] The Court has two concerns with this summary. The Trust seems to indicate that in its benevolence, it allowed other claimants to proceed before it did in trying to recoup funds. Many of the claimants, however, were already higher in priority than the Trust so they would have received funds first in any event. Second, the explanation of the timing of any "risk" to the Trust is a bit muddy. While Semones' indictment, the subsequent sale of the property, and COVID-19 changed things for the Trust (and others), is it somewhat disingenuous to say these events created risks for the Trust that were not already there. The Trust had already agreed in October 2019 to a reduced payment of $500,000 (*See* BK Case No. 19-40057-JMM, Dkt, 72, at 7), so that risk was present long before Semones' indictment (in February 2020), the sale of the property (May 1, 2020), or the COVID-19 pandemic (March 2020).

any interest in the forfeited funds.

The Trust does not argue that this is a "co-mingling" of funds case.[13] Maybe it could have; maybe not. But the fact remains that it cannot show that the forfeited funds came directly from (or are even related to) its $1 million loan. Yes, it had an interest in some of the money that went into the project, but it has not convinced the Court that it has any interest in the *fraudulently* obtained proceeds that came out of the project.

Unlike the third party in *Wilson*, there is no indication that Semones used the Trust's $1 million loan for any improper purpose. To be fair, the Trust does not specifically argue that Semones used its money for an improper purpose; however, it does argue that Semones fraudulently induced it into making the loan in the first place and had he been more forthcoming, it would never have made the loan. The Court has already rejected this argument.

The Trust tries to clarify by reiterating that it is not seeking "to obtain money *created* by criminal activity" but to "have money *which existed prior to the crimes* returned to it." Dkt. 54, at 2 (emphasis in original). In other words, the Trust claims it had an interest in the home (via the loan) and, therefore, it now has an interest in the proceeds of the sale of the home.[14] But that is the problem. The money the Trust claims to have an interest in *was*

---

[13] As the name suggests, there are often cases where a person acquires assets with legitimate funds alongside fraudulently obtained funds. In those circumstances, it is very difficult to determine which funding source was used to obtain the forfeited asset(s).

[14] Said another way, the Trust is treating this situation like any investment or contract case. They put money into the project; they have yet to be paid; money came out of the project; they should be entitled to some of that money. Again, however, this explanation is missing a critical fact: that the proceeds were fraudulently obtained. The Court frankly does not take issue with the idea that the Trust had an interest in the money it loaned Semones (and, therefore, potentially the house) but it cannot take the next step and find the Trust

*derived from, and is traceable to* (i.e. in the Trust's words: "was created by") criminal activity.

Because the Trust cannot meet its statutory obligations under 21 U.S.C. §853, the Court cannot grant its petition.

### V. CONCLUSION

The Trust's burden is that of a preponderance of the evidence. This is colloquially referred to as the "more than 50% standard." And while the Trust has put forth good legal arguments today, the Court finds it has not met the requisite burden to push it over that halfway mark, and cannot grant its request.

To afford the Trust every benefit, the Court finds it has standing to bring its petition. The Court will also accept the Trust's argument that its interest is secured, but unperfected. The Court rejects, however, the Trust's argument that a constructive trust formed and that its interests is superior to the Government's.

These findings aside, the crux of the matter is that the Trust cannot trace any interest it has to the forfeited funds. This is the gap the Court is unwilling to bridge. Ultimately, the Trust is nothing more than an unsatisfied creditor.[15] The Trust is not a victim of Semones' crime in the traditional sense and the forfeited funds are not just a large pool of money to be dipped into by anyone who has a claim against the defendant. A person or entity can only access the forfeited funds if it can trace a legal right to *those* funds. Thus, while the

---

had any interest *in the proceeds of Semones' crime* without some evidence in support. That proposition is too far removed.

[15] The Court does not mean that despairingly or to begrudge the Trust, but rather that it is unsatisfied because it has an outstanding balance on a valid loan.

Trust has a valid contract against Semones before and after the crime—and Semones owes the Trust money under that contract—the Trust cannot recover those funds in this *criminal case*. The Trust interest is "against" Semones, not the forfeited funds. The proceeds of Semones criminal activity are simply too far removed to grant the Trust's request.

Because the Court is not persuaded that the Trust has "a legal right, title, or interest in the [forfeited] property" and that its interest "renders the order of forfeiture invalid" it must deny the Petition. 21 U.S.C. § 853(n)(6)(A).

## VI. ORDER

1. The Trust's Petition (Dkt. 53) is DENIED.

2. The Government shall submit a proposed final order of forfeiture which the Court will review and issue.

DATED: June 30, 2021

David C. Nye
Chief U.S. District Court Judge